UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Nadine Thompson,
     Plaintiff

     v.                                Civil No. 04-cv-313-SM
                                        Opinion No. 2006 DNH 017
Southwest Airlines Co.,
     Defendant

## O R D E R

Nadine Thompson, an African-American woman, has sued Southwest Airlines Co. ("Southwest") for damages arising from Southwest's insisting that she purchase an additional seat under its customer of size policy. Specifically, Thompson asserts discrimination claims under N.H. Rev. Stat. Ann. ("RSA") § 354-A:17 (Count I), 42 U.S.C. § 1981 (Count III), and 42 U.S.C. § 2000d (Count IV), as well as a state common law claim for intentional infliction of emotional distress (Count II). Before the court is defendant's motion for summary judgment. Plaintiff objects. For the reasons given, defendant's motion for summary judgment is granted in part and denied in part.

## Summary Judgment Standard

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party

is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero–Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50 (1986)). "The role of summary judgment is to pierce the boilerplate of the pleadings and provide a means for prompt disposition of cases in which no trial–worthy issue exists." Quinn v. City of Boston, 325 F.3d 18, 28 (1st Cir. 2003) (citing Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

"Once the movant has served a properly supported motion asserting entitlement to summary judgment, the burden is on the nonmoving party to present evidence showing the existence of a trialworthy issue." Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 39 (1st Cir. 2004) (citing Anderson, 477 U.S. at 248; Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  To meet that burden the nonmoving party, may not rely on "bare allegations in [his or her] unsworn pleadings or in a lawyer's brief." Gulf Coast, 355 F.3d at 39 (citing Rogan v. City of Boston, 267 F.3d 24, 29 (1st Cir. 2001); Maldonado–Denis v. Castillo–Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)).  When

ruling on a party's motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 37 (1st Cir. 2003) (citing Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 185 (1st Cir. 2003)).

### Background

The record discloses that Nadine Thompson is approximately five feet eight inches tall and, at the relevant time, weighed between 300 and 330 pounds.

On June 9, 2003, Thompson missed her Southwest Airlines flight from Manchester to Chicago, due to unexpected delays occasioned by long security check lines.  She went to the customer service desk to make other arrangements.  She was treated cordially, and with respect.  The female agent issued her a new ticket to Chicago, via Nashville, on a flight that was leaving Manchester shortly.  The agent also handed her a new boarding pass and directed Thompson to go right to the gate and board the plane, which she did.  A male Southwest employee was standing behind the service counter observing her, but said nothing.  Neither agent suggested that she qualified as a

customer of size, or that she would be required to buy a second seat.

Thompson went to the gate and boarded Southwest Flight 1290 to Nashville.  The gate agent also was cordial and welcomed her on board.  Nothing was said at the gate about Thompson's possibly qualifying as a customer of size.  After she took a seat and buckled her seatbelt, Southwest Operations Supervisor Joel Drake came onto the aircraft.  Drake thought Thompson was encroaching upon the space reserved for the seat next to hers.  He left the aircraft without speaking to Thompson.  Shortly thereafter, Southwest Customer Service Supervisor Dave Wilson boarded the plane.  He also determined that Thompson appeared to occupy more than the space associated with her seat, and he also left the plane without speaking to her.  While he was on the plane to observe Thompson, Wilson stopped and spoke with a woman of color and asked to see her ticket.  After Drake and Wilson both observed Thompson, they conferred on the loading bridge and agreed that she appeared to be what Southwest calls a "customer of size" ("COS").  (It was either Drake or Wilson that had been behind the customer service counter when Thompson was reissued her ticket and boarding pass.)

4

"Customer of size" is a term of art used by Southwest to classify passengers it requires to purchase a second seat, for their own comfort and safety, as well as for that of their fellow passengers.  The term is discussed and explained in a variety of Southwest documents.  According to a Southwest document titled "PR COS Statement":

> As a Company committed to serving our Customers in safety and comfort, we feel the definitive boundary between seats is the armrest(s).  If a Customer cannot lower the armrest(s) and encroaches on a portion of another seat, a Customer seated adjacent would be very uncomfortable and a timely exit from the aircraft in the event of an emergency might be compromised if we allowed a cramped, restricted seating arrangement.

(Pl.'s Obj. to Summ. J., Ex. 27C.)  Southwest's "Student Manual" for "Operations Classroom Training" provides: "A Customer who must raise the armrest(s) to be seated comfortably, thereby compromising the adjacent seat(s), is considered a Customer of size."  (Pl.'s Obj. to Summ.  J., Ex. 151C.)  In a training memo, Southwest explained:

> When we refer to Customers of size who need to purchase two seats, we are talking about those Customers who obviously need to lift the armrest(s) to fit and who will definitely be in a portion or all of the seat next to him/her. . . .  A COS cannot sit in a seat without having the armrest(s) raised, and cannot adjust the size of his lower body in a manner as to avoid compromising the seat adjacent to him.

(Pl.'s Obj. to Summ. J., Ex. 185C (emphasis in the original).

Section 04.020.81 of Southwest's General Operations Manual

provides: "'Customer of size' is the appropriate term to use when

referring to a Customer who will occupy more than one seat

because of size."  (Pl.'s Obj. to Summ. J., Ex. 270C.)  Finally,

a Southwest web page titled "Customer of Size Q&A" states: "What

is the definitive gauge for a Customer of size?  The armrest is

the definitive gauge, as it serves as the boundary between

seats."[1]  (Pl.'s Obj. to Summ. J., Ex. 1019.)

    According to various policy statements, Southwest strives to

address COS issues at the earliest possible point of contact with

---

[1] Thompson does not allege that she did not encroach upon
the adjoining seat's space.  Instead she makes a legal argument:
that her ability to put the seat's armrest down definitively
establishes that she was not a "customer of size," within the
meaning of Southwest's policy.
    In her statement of disputed facts, Thompson asserts
"[p]laintiff disputes that Wilson observed that [her] hips and
thighs protruded into [an] adjoining seat . . .," and in support
cites three passages from her deposition.  However, none of those
passages includes a statement that plaintiff did not occupy more
than one seat.  Specifically, plaintiff testified: "I sat down, I
buckled my seat belt; I put my armrest down," (Pl.'s Obj. to
Summ. J., Ex. 4 (Thompson Dep.) at 36); "My seat belt is buckled,
my armrest is down.  Why are you asking me to purchase another
ticket or get off the plane?" (Thompson Dep. at 40); and "He has
yet to say to me you're too fat, your armrest doesn't go down,
your seatbelt doesn't buckle, you are encroaching on the other
seat.  He said nothing of the sort; he just said and repeated
several times, for your safety and comfort I need you to purchase
another ticket." (Thompson Dep. at 41.)

passengers who may qualify, <u>i.e.</u>, at check-in or, failing that, in the gate area, prior to boarding.  (<u>See</u>, <u>e.g.</u>, Pl.'s Obj. to Summ. J., Exs. 13, 14, 16, and 20.)  Southwest's policy also does not require passengers to purchase a second seat in mid-trip or once they have boarded a flight.  (<u>See</u> Pl.'s Obj. to Summ. J., Ex. 170C.)  However, that same policy requires that when a COS has boarded a flight without purchasing a second seat, that person must be told of the COS policy and informed that he or she will have to purchase a second seat the next time he or she flies with Southwest, on a return flight or otherwise.  (<u>Id.</u>)

After speaking with Drake, Wilson boarded the plane a second time and asked Thompson to accompany him back onto the loading bridge.  On the loading bridge, Wilson spoke to Thompson.  He told her that "for her comfort and safety" she needed to purchase a second seat.  According to both Drake and Wilson, Thompson asked whether her ticket was refundable if she decided not to take the Southwest flight.[2]  Thompson told Wilson and Drake that she "felt quite safe and . . . was comfortable," and that she was "not going to purchase a second seat for [any] reason."

---

[2] Thompson does not mention this detail in her version of events, nor does she dispute it.  (Pl.'s Obj. to Summ. J., Ex. 1).

(Thompson Dep. at 39-40.)  Then she reboarded the aircraft,
returned to her seat, buckled the seatbelt, and put the armrest
down.  After Thompson went back onto the plane, Drake telephoned
Southwest headquarters to find out what to do about Thompson's
refusal to purchase a second seat.  He was told to call airport
security for assistance in removing Thompson from the aircraft,
if necessary.  He called security, and two deputy sheriffs came
to the gate area.

    After Wilson discussed the situation with Drake, two local
deputy sheriffs, and another Southwest Customer Service
Supervisor (Laurie Forbush), he went back onto the aircraft to
discuss the situation with Thompson.  He told her that her ticket
was fully refundable.  Thompson showed Wilson that she was able
to buckle her seatbelt and put her armrest down.  Wilson,
however, says that, even with the armrest down, Thompson's hips
and thighs encroached on the adjoining seat's space.  But, taking
the evidence in the light most favorable to Thompson, after she
demonstrated that she could lower the armrests with ease, and sit
comfortably, he said nothing, but glowered in apparent anger.
Then he turned and abruptly left the aircraft in a manner
suggesting that he was angry.  Thompson says no Southwest agent
ever gave any explanation for their insistence that she buy a

8

second seat, but simply repeated the mantra "for your own comfort
and safety, etc. etc."  The customer of size policy was not
explained to her by anyone.  As Wilson was walking up the aisle,
Thompson, frustrated and humiliated, collected her belongings and
followed him off the plane.  In the words of plaintiff's
complaint:

> On further reflection while [sitting] in her seat upset
> and humiliated over the public encounter the Plaintiff
> concluded that Southwest did not want her on their
> plane and considering how she felt publicly humiliated
> she did not want to continue giving them her business.
>
> Plaintiff unbuckled her seat belt gathered her
> belongings and exited the plane.

(Compl. ¶¶ 41-42.)


On the loading bridge, on her way back to the gate area,
Thompson encountered Drake, Forbush, and the two deputy sheriffs.
There she asked Wilson: "Did you ask me to purchase another
ticket because I'm too fat to sit in the seat; did you ask me to
purchase another ticket because I'm a black woman?"  (Thompson
Dep. at 98.)  She also asked: "do you call the sheriffs, you
know, just for random fat people or do you call the sheriffs for
black people?"  (Thompson Dep. at 100.)

Drake, Wilson, Forbush, and the two deputy sheriffs escorted Thompson from the loading bridge to the ticket counter, where she obtained a refund for the ticket she purchased.  Between the entrance to the loading bridge and the ticket counter, Thompson shouted to those in the area that "Southwest has just asked me to get off the plane either because I'm too fat or too black or just a woman . . ."  (Thompson Dep. at 108; see also id. at 105.) After Wilson refused to give Thompson his name, she screamed at him, calling him a "––––––– coward" and a "––––––– racist pig." (Thompson Dep. at 57–58.)  By all accounts, no Southwest employee used any words that were explicitly or implicitly racist or sexist in character.  (Thompson Dep. at 112.)  Plaintiff's claim of racial animus rests on "the aggression and tone" displayed by Wilson and Drake (Thompson Dep. at 112), Wilson's conversation with another African-American woman on the plane, and the fact that Wilson and Drake were acting in contravention to, not consistently with, Southwest's actual policy relative to customers of size.

Once Thompson's ticket was refunded, the deputies escorted her from the ticket counter to the main terminal area.  Thompson says the deputies were kind and consoling.  They expressed exasperation at Southwest's behavior.  The deputies offered their office as a place for Thompson to compose herself, provided her

10

with coffee, and volunteered to assist her in rebooking on
another airline.  With their help, Thompson was booked on a
United Airlines flight leaving a bit later that day (she did not
have to purchase a second seat).

Thompson sued Southwest for intentional discrimination
(Counts I, III, and IV) and for intentional infliction of
emotional distress (Count II).  Her basic point is this: because
she could demonstrably buckle her seatbelt, lower her armrest,
and ride comfortably, she was not, by the terms of Southwest's
own policy, a customer of size.[3]  She says that because she was
not a customer of size, and, even if she was, Southwest's policy
specifically did <u>not</u> require her to buy a second seat after she
was allowed to board, Wilson and Drake must have had some other
reason for asking her to purchase a second seat.  Because Wilson
looked at the ticket of another customer of color when he boarded
the aircraft (which was odd, since Southwest has open, not
reserved, seating), and used an angry and aggressive tone with
her, particularly when he must have realized that she was not a
customer of size under the policy (and did not have to buy a

---

[3] Thompson also notes that she had never before been
subjected to the Southwest COS policy, although she routinely
flew on Southwest.

second seat even if she was), the reason for asking her to
purchase a second ticket was not related to a legitimate interest
in enforcing company policy, but was racially motivated.[4]

**Discussion**

A. Count III: 42 U.S.C. § 1981

In Count III, plaintiff asserts that defendant violated
42 U.S.C. § 1981 by discriminating against her in the making and
enforcement of her contract to fly on Southwest Airlines.
Specifically, she asserts: "Defendant Southwest engaged in

---

[4] In her objection to defendant's motion for summary
judgment, plaintiff explains:

> But for defendant's employee, Dave Wilson's action of
> first entering the [aircraft] while plaintiff was in
> her seat and first finding another black woman to
> question, plaintiff might not have known that her race
> and gender played a factor in her selection for the COS
> policy.

(Pl.'s Obj. to Summ. J. at 10.)  She further explains:

> Based on the fact that Wilson came on the flight
> looking for an African American woman [and] found one
> other than Ms. Thompson and left the aircraft and
> returned moments later this time locating Ms. Thompson,
> who by defendant's own documentation did not fit the
> requirements of policy of COS, is evidence that her
> status as an African American woman played a
> substantial part in the employees selection for an
> additional charge for service to fly with defendant on
> the morning of June 9, 2003.

(Obj. to Summ. J. at 12-13.)

intentional discrimination on the basis of Plaintiff's race, color and gender in removing her from Defendant's plane on or about June 9, 2003." (Compl. ¶ 66.) Plaintiff left the plane of her own accord, as Wilson and Drake were about to board the plane with sheriff's deputies to physically remove her. (See Compl. ¶¶ 42-43; Thompson Dep. at 40, 52-53, 96-97). Her claim, properly construed, is that Southwest denied her the right to fly unless she purchased a second seat, and did so because of her race. Defendant moves for summary judgment on grounds that plaintiff has presented neither direct nor indirect evidence of intentional racial discrimination, and has presented no evidence to suggest that Southwest's stated reason for its actions was in fact a pretext for racial discrimination.[5]

"To state a claim under [42 U.S.C. § 1981], a plaintiff must show (1) that [s]he is a member of a racial minority, (2) that the defendant discriminated against h[er] on the basis of h[er] race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute." Garrett v. Tandy

---

[5] Defendant also points out, and defendant does not appear to contest, that gender discrimination claims are not cognizable under 42 U.S.C. § 1981. Defendant is correct. See Runyon v. McCrary, 427 U.S. 160, 167 (1976). Plaintiff's § 1981 claim is limited to a claim of racial discrimination.

Corp., 295 F.3d 94, 98 (1st Cir. 2002) (citing Morris v. Dillard Dep't Stores, Inc., 277 F.3d 743, 751 (5th Cir. 2001)).  In cases brought under 42 U.S.C. § 1981, as in Title VII cases, where the plaintiff offers no direct evidence of discrimination, the court employs the McDonnell Douglas-Burdine-Hicks burden-shifting analysis.  See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001) (citing Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999)).

Under the McDonnell-Douglas paradigm, "the plaintiff 'must carry the initial burden . . . of establishing a prima facie case of . . . discrimination." Id. (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  If the plaintiff does so, then it falls to the defendant "to articulate 'a legitimate, non-discriminatory reason for its adverse . . . action.'" Straughn, 250 F.3d at 33 (citations omitted).  Then, if the defendant "proffers a nondiscriminatory reason for its action, the burden shifts back to the plaintiff to show that the reason . . . was a coverup for a discriminatory decision." Id. at 34 (citations and internal quotation marks omitted).  "Despite these shifting burdens of production, the plaintiff throughout retains the burden of persuasion." Conward, 171 F.3d at 19 (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991)).

14

The court of appeals for this circuit has not yet described the elements of a prima facie case applicable to a § 1981 claim arising out of the purchase of goods and services or the denial of access to a public accommodation.  The Fourth Circuit, however, described the elements of a "cause of action relating to the purchase of goods or services," in Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).  In another denial of services case, the Sixth Circuit adopted a slightly more plaintiff-friendly set of elements, under which a plaintiff must prove:

> (1) plaintiff is a member of a protected class;
> (2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and
> (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 872 (6th Cir. 2001) (adopting test first used in Callwood v. Dave & Buster's, Inc., 98 F. Supp. 2d 694 (D. Md. 2000)).  The Fourth Circuit, in Williams, thought Callwood unpersuasive, noting "Callwood purports to provide an alternative analytical approach in public accommodation discrimination cases in which there is scant evidence as to how members of the protected class are treated

15

differently from members outside the class."  372 F.3d at 668
n.5.  That may be so, but given that "the prima facie case is 'a
small showing that is not onerous and is easily made,'" Che v.
Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003) (quoting
Koseris v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003)), and
given the preference, in this circuit, for considering
comparative evidence under the third step of McDonnell Douglas,
see Conward, 171 F.3d at 19, this court will employ the less
stringent test set out in Christian.

     Plaintiff has produced sufficient evidence to establish the
first two elements of her prima facie case.  As an African
American, she is a member of a protected class, and she entered
into and attempted to enforce a contractual relationship with
Southwest.

     Regarding part (a) of the third element, relating to
treatment of similarly situated persons outside the protected
class, plaintiff saw "other large women [presumably like her, as
she claims, not qualifying as customer of size] on that flight
who were not asked to purchase another ticket."  (Thompson Dep.
at 33.)  But, her evidence on that score is weak.  It consists of
an assertion that "60% of our population is overweight, so [she]

would assume that 60% of the women on the flight were possibly
overweight and [she] was the only person asked to purchase
another seat" (Thompson Dep. at 33), and that "it's pretty common
sense that if you went to the airport right now, that there are
probably hundreds of white males who weigh what [Thompson]
weigh[s] who are getting on flights without incident every day."
(Thompson Dep. at 43.)

Regarding part (b) of the third element, relating to
"hostile" and "objectively discriminatory" service, plaintiff
points to a number of disturbing factors:  the "aggression and
tone" that Wilson used with her (Thompson Dep. at 112); Wilson's
conversation with another woman of color; the refusal to explain
the customer of size policy, or to respond in a civil manner to
her inquiries, but instead merely repeating "for your own comfort
and safety . . . etc."; and the plain misapplication of the COS
policy to her (both because she demonstrably was not a customer
of size, and, even if she was, because the policy did <u>not</u> require
her to buy a second seat after the gate agent freely boarded
her).

Plaintiff's evidence is not particularly strong on the
overall merits, but it is sufficient to establish the third

17

element.  The prima facie burden is a light one, <u>see</u> <u>Che</u>, 342
F.3d at 38, and, positing liberal inferences favorable to
plaintiff, the court will proceed to the second step of the
<u>McDonnell Douglas</u> analysis.

Defendant "articulate[ed] 'a legitimate, non-discriminatory
reason for its adverse . . . action.'" <u>Straughn</u>, 250 F.3d at 33.
Plaintiff's height and weight are undisputed as are Drake's and
Wilson's observations that plaintiff's body encroached upon the
space reserved for the adjacent seat.  Thompson has never said
that she did not encroach on an adjacent seat; she only says that
she was able to put her armrest down and ride comfortably.
Southwest argues that its agents were simply enforcing, in good
faith, its COS policy, which, if true, would qualify as a
legitimate non-discriminatory reason for Southwest's agents to
tell Thompson she needed to purchase a second seat.

Because defendant produced evidence of a legitimate non-
discriminatory reason for its action, plaintiff can avoid summary
judgment only by producing evidence from which it can be found
that defendant's "action was the result of discriminatory
animus." <u>Che</u>, 342 F.3d at 39.  "Evidence that the [defendant's]
stated reasons [for taking an allegedly discriminatory action]

18

are pretextual can be sufficient for a jury to infer
discriminatory animus."  Id.  Pretext, in turn, can be proven:
(1) by "show[ing] that discriminatory comments were made by the
key decisionmaker or those in a position to influence the
decisionmaker," Santiago-Ramos v. Centennial P.R. Wireless Corp.,
217 F.3d 46, 55 (1st Cir. 2000) (citation omitted); (2) by
"show[ing] that [the] nondiscriminatory reasons were after-the-
fact justifications, provided subsequent to the beginning of
legal action," Santiago-Ramos, 217 F.3d at 56 (citation omitted);
(3) "by presenting evidence of disparate treatment," Che, 342
F.3d at 39 (citation omitted); or (4) by "by showing that the
[defendant's] proffered explanation is unworthy of credence.'"
id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.
133, 143 (2000)).

Here, plaintiff concedes that no Southwest employee made any
explicitly or implicitly racist remarks (Thompson Dep. at 111-
12), and defendant's reasons for asking Thompson to purchase a
second seat are not after-the-fact justifications; those reasons
were, in a sense, given at the time, albeit not clearly.  In
fact, Thompson's demonstration to Wilson that she could lower her
armrest, and her comments to other passengers in the gate area,
demonstrate that applicability of the COS policy to her was

19

Southwest's ostensible reason for its actions long before suit
was filed.

Plaintiff's weak suggestion of disparate treatment might be
glossed over with regard to her prima facie burden, but it is
plainly not sufficient to meet the more demanding burden of
establishing pretext.  See Koseris, 331 F.3d at 213 ("The pretext
analysis . . . is more demanding.") (citing Tex. Dep't of Cmty.
Affiars v. Burdine, 450 U.S. 248, 255 (1981)).  She testified
that "there were other large women on that flight who were not
asked to purchase another ticket."  (Thompson Dep. at 33.)
Subsequently, however, she stated that "she could not tell . . .
anything about them."  (Thompson Dep. at 35.)  The rest of her
evidence, consisting of general, but unhelpful, statistical
information, and common sense presumptions about white males who
fly Southwest, is even weaker.  In short, plaintiff's generalized
belief that there must have been other similarly situated white
people on the plane who were treated differently is insufficient
to establish disparate treatment or pretext.

Plaintiff relies primary upon the fourth method of
establishing pretext, by attempting to show "weaknesses,
implausibilities, inconsistencies, incoherencies, or

contradictions in the [defendant's] proffered legitimate reasons'
such that a factfinder could 'infer that the [defendant] did not
act for the asserted non-discriminatory reasons.'"  Santiago-
Ramos, 217 F.3d at 56 (quoting Hodgens v. Gen. Dynamics Corp.,
144 F.3d 151, 168 (1st Cir. 1998)).


       Here, her case is arguably more solid.  A rational
factfinder could reasonably conclude that defendant's explanation
for the conduct of Drake and Wilson is unworthy of credence.
Plaintiff asserts that she was able to put her armrest down and
ride comfortably.  If she was able to put the armrest down and
ride comfortably she was not, it would seem, from Southwest's own
policy statements and clarifications, a customer of size.  She
has a point – the Southwest policy is poorly drafted, but, it
does admit of a reasonable construction that precludes COS status
for any passenger who can get the armrest down while seated, or
can be seated without raising the armrest.  (Again, the policy
and clarifications are poorly drafted and lend themselves to a
wide range of differing interpretations.)


       A jury may find that Drake and Wilson plausibly thought
plaintiff qualified as a customer of size, and were simply
ignorant of the terms of Southwest's actual policy – both with

respect to who qualified as a COS, and (perhaps less understandably) whether an already-boarded passenger must buy a second seat even if a COS.  A jury might further find that plaintiff <u>was</u> a COS, or, that while Drake and Wilson were incompetent, or merely mistaken, race played no role in their enforcement actions.

But, on the other hand, on this record a jury could find that Drake and Wilson misapplied Southwest's COS policy if, indeed, a passenger who can lower her armrest is not a COS under the policy.  And a jury could find that Drake and Wilson plainly misapplied the policy when they insisted that Thompson buy a second seat or be physically removed from the plane.  The policy unmistakably provides that passengers are <u>not</u> to be charged for a second seat after they have boarded a flight.  So, Drake's and Wilson's inexplicable violation of that part of the policy will require explanation – and that explanation may or may not be believed.

Accordingly, on this record, a jury could well find that Southwest's non-discriminatory explanation for its agents' conduct is false – that is, that Drake and Wilson were not ignorant or incompetent, but rather deliberately misapplied the

policy to Thompson.  And, the jury may determine that racial animus is a fair explanation for that false explanation of Southwest's actions and its agents' misapplication of its policy. For those reasons, Southwest is not entitled to judgment as a matter of law on Count III.

B. Counts I and IV

Defendant is entitled to judgment as a matter of law on Count IV, brought under 42 U.S.C. § 2000(d) because Southwest is not a recipient of federal financial assistance, a necessary prerequisite to liability under Title VI.  Plaintiff bases her Title VI claim on defendant's receipt of federal assistance from the United States Department of Transportation pursuant to sections 101 and 103 of the Air Transportation Safety and System Stabilization Act, Pub. L. No. 107–42, 115 Stat. 230 ("the Stabilization Act").

In Shotz v. American Airlines, Inc., 420 F.3d 1332 (11th Cir. 2005), the Eleventh Circuit held that compensation under the Stabilization Act is not federal assistance for Rehabilitation Act purposes.  Id. at 1136–38.  The definition of federal assistance is the same for Title VI as it is for the Rehabilitation Act.  See Jacobson v. Delta Airlines, Inc., 742

23

F.2d 1202, 1209 (9th Cir. 1984) ("The legislative history of the Rehabilitation Act . . . indicates that those terms [including "federal financial assistance"] were to be given the same meaning as the same terms in . . . 42 U.S.C. § 2000d–1 (1982) (Title VI)).

The persuasive reasoning of <u>Shotz</u> applies with equal force to the facts of this case: Southwest is not a recipient of federal financial assistance for purposes of Title VI.  Because Southwest is not a recipient of federal financial assistance (plaintiff appears not to press this point in her objection to summary judgment) defendant is entitled to judgment as a matter of law on Count IV.

Defendant is entitled to judgment as a matter of law on Count I, a state law claim under N.H. Rev. Stat. Ann. ch. 354-A because RSA 354-A does not reach air travel.  The statute defines "public accommodation" to include "any . . . public conveyance on land or water."  RSA 354-A:2, XIV.  By adding the qualifier "on land or water," the legislature plainly limited the scope of the state statute, excluding commercial aircraft from the reach of the term "public conveyance."

C. Count II: Intentional Infliction of Emotional Distress

In Count II, plaintiff asserts that defendant intentionally inflicted emotional distress on her when Drake and Wilson removed her from Flight 1290.  Defendant moves for summary judgment on Count II on grounds that: (1) it is preempted by the 1978 ADA; and (2) the conduct alleged by plaintiff is not sufficiently outrageous to state a claim for intentional infliction of emotional distress; and (3) plaintiff has not alleged an adequate factual basis to support a claim for severe emotional distress.

Under New Hampshire law, "one who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for that emotional distress."  Konefal v. Hollis/Brookline Coop. Sch. Dist., 143 N.H. 256, 260 (1998) (citing Morancy v. Morancy, 134 N.H. 493, 495 (1991)).  New Hampshire generally follows the Restatement, see, e.g., Morancy, 134 N.H. at 496; Jarvis v. Prudential Ins. Co. of Am., 122 N.H. 648, 652 (1982), which provides, in pertinent part:

> Liability has been found only where the conduct has
> been so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of decency,
> and to be regarded as atrocious, and utterly
> intolerable in a civilized community.  Generally, the
> case is one in which the recitation of the facts to an
> average member of the community would arouse his

> resentment against the actor, and lead him to exclaim, "Outrageous!"
>
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. . . . [P]laintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.  There is no occasion for the law to intervene in every case where some one's feelings are hurt.

RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965).

The undisputed facts of this case, viewed in the light most favorable to plaintiff, do not amount to extreme and outrageous conduct.  No reasonable jury could find defendant liable for intentional infliction of emotional distress on this record, even viewing the facts in the light most favorable to the plaintiff. Defendant's agents employed no derogatory language of any sort related to race, gender, or plaintiff's physical size.  If anything, Wilson stated his concerns with sufficient tact that plaintiff had difficulty determining the reason for the conversation on the loading bridge.  (See Thompson Dep. at 40). Moreover, rather than speaking with plaintiff about the COS policy while she was in her seat, in front of passengers seated around her, Wilson asked her to go out onto the loading bridge where they could speak privately.  Plaintiff's claim rests primarily upon her assertion that Wilson and Drake sought to

26

apply the COS policy to her even though they knew that she did not meet the customer of size criteria, and even though they knew she did not have to buy a second seat because she had already been boarded.  But, again, plaintiff did not plainly fall outside the ambiguous operative policy definition of a COS, and Drake and Wilson might have believed she was a COS given the observations they made (her alleged encroachment upon the adjacent seating space).  Neither Wilson nor Drake stepped beyond the bounds of decency by initiating a discreet conversation with her about the COS policy, and their insistence that she buy a second seat or be removed from the plane may well have been mistaken, but their outward conduct in enforcing that mistake was not outrageous in any respect.  Accordingly, defendant is entitled to judgment as a matter of law on Count II.


### Conclusion

For the reasons given, defendant's motion for summary judgment (document no. 12) is granted as to Counts I, II, and IV, but otherwise denied.

27

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

February 6, 2006

cc:  Alfred E. Saggese, Jr., Esq.
     Mark F. Sullivan, Esq.
     Neil Osborne, Esq.
     Brian P. Sexton, Esq.
     Garry R. Lane, Esq.